THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CRAIG BROCK, Defendant-Appellant.

First District (6th Division)   No. 1—90—0147

Opinion filed December 30, 1992.

EGAN, P.J., specially concurring.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, and Winston & Strawn, both of Chicago (Julie A. Bauer, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Laura E. Forester, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Craig Brock, was found guilty of murder and armed robbery of Michael Spivery and armed robbery of Ernest Catchings and Michael Pate. Defendant was sentenced to a term of 60 years' imprisonment on the murder count. He appeals, contending that the trial court erred by permitting psychiatric testimony concerning defendant's comprehension of the *Miranda* warnings; that defendant did not knowingly and intelligently waive his *Miranda* rights; that the court erred by refusing to sever the trial on the charges relating to the Catchings-Pate armed robbery where the offenses were not part of the same transaction; that hearsay evidence was improperly admitted; and that the court erred in refusing to give the jury defendant's proffered jury instruction on involuntary manslaughter.

Prior to trial, defendant made a motion to suppress statements,

contending that he was incapable of understanding the full meaning of the *Miranda* rights. In support of his motion, defendant tendered the psychiatric evaluation of Doctor Alan K. Rosenwald, who examined defendant on December 4, 1988. Doctor Rosenwald opined after examination that defendant had a reading problem, was suffering from a mental defect, and that "his verbal skills are so limited that he lacks an intelligent understanding of his rights."

Thereafter, the State sought a psychiatric examination to ascertain whether defendant was able to understand his *Miranda* rights. The State argued that pursuant to section 104—11(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 104—11(a)), the issue of defendant's fitness for trial, to plead or to be sentenced may be raised by the defense, the State or the court at any appropriate time before a plea is entered. Over defendant's objection, the trial judge ordered defendant to be examined for fitness and sanity. Defendant's request that an attorney be present for the psychiatric evaluation was denied.

## MOTION TO SUPPRESS STATEMENTS

Prior to trial, defendant moved to suppress statements taken from him while in police custody. Detective Thomas Pufpaf of the Chicago police department testified that on September 1, 1987, he was investigating the Spivery homicide and the Catchings-Pate armed robbery. Defendant arrived at the police station accompanied by his mother and stepfather. Pufpaf advised defendant of his *Miranda* rights, which defendant indicated that he understood. Later that evening, Assistant State's Attorney Mark Fuller spoke with defendant and informed him of his *Miranda* rights. Defendant again indicated that he understood those rights. The following morning, Pufpaf had another conversation with defendant and advised him of his *Miranda* rights. After defendant indicated his understanding, Pufpaf conducted an interview with him.

At approximately 11 a.m., defendant spoke with both Assistant State's Attorney Schreiber and Pufpaf. Schreiber told defendant that he was a State's Attorney, not defendant's attorney, and that he was working with the police. Defendant indicated that he understood. Schreiber advised defendant of his constitutional rights and told defendant that he wanted to reduce his statement into written form by a court reporter. Defendant stated that this arrangement was acceptable to him. Upon the arrival of the court reporter, defendant was again apprised of his constitutional rights. Schreiber went over the typewritten statement with defendant, who reviewed and initialed the bottom of each page. After Schreiber made a number of changes

requested by defendant, the last page was signed by defendant. Pufpaf stated that defendant was fed and allowed to use the rest room, and that he was not struck by a chair or any other object. Defendant never indicated that he did not understand the *Miranda* warnings.

Schreiber's testimony essentially paralleled that of Pufpaf. Defendant stated that he had been not been mistreated in any way and that he was not under the influence of drugs or alcohol. Schreiber noticed that defendant appeared to have a swollen lip and that he had a couple of old bandages on his fingers. Defendant told him that the swollen lip was the result of a basketball injury and that the bandages were covering stitches for an injury sustained four weeks prior to arrest. Schreiber had no difficulty communicating with defendant, who was coherent and responsive.

Doctor Alan K. Rosenwald, a clinical psychologist, testified at the hearing on behalf of defendant. In December 1988, Doctor Rosenwald administered certain diagnostic tests to defendant. Based upon the achievement test results, he found that defendant was functionally illiterate and that he read below the third-grade level. He opined that defendant was borderline mentally defective and that his vocabulary and reading skills were extremely limited.

Doctor Rosenwald stated that repetition of the *Miranda* warnings would not have increased defendant's comprehension of the concept behind the right. Although defendant appeared to possess sufficient abilities to memorize his rights, his understanding was likely to be very limited. The doctor considered defendant to be functionally retarded.

On cross-examination, Doctor Rosenwald testified that the public defender's office contacted him and requested a psychological evaluation of defendant with reference to intelligence and intellectual factors. He did not examine defendant for his fitness or competency to stand trial. Defendant's intelligence quotient was 72, two points above the level of retardation. Assuming that defendant had prior contacts with the law, he still would have been unable to have an intelligent understanding of the *Miranda* warnings.

Defendant's fifth-grade teacher, Millicent Drower, testified on his behalf at the hearing. Defendant was a participant in her program for students who were two years behind in reading and mathematics. Drower stated that defendant's first reaction was to indicate that he understood an instruction even when he did not. Drower considered this behavior to be a defense mechanism designed to protect his self-image. Drower did not believe that defendant would be able to comprehend his right to legal counsel, to have an attorney appointed for him if he could not afford one, and the right to remain silent. De-

fendant advanced only one month in his reading skills while he was a student in Drower's classroom.

Marlene Wolter, defendant's sixth- and eighth-grade teacher, also testified on his behalf. Defendant was promoted to her classroom only by virtue of his age and was in a learning disorder program. According to Wolter, defendant had a great deal of difficulty with the printed page, and also with verbal instructions. In order for defendant to comprehend an instruction, it would have to be repeated so that the vocabulary involved was something that he understood.

The parties stipulated that on December 5, 1987, defendant was given a physical examination by Doctor Aaron Hamb of Cermak Hospital. Defendant told Doctor Hamb that he had been injured when he was hit with a chair on his right side three months earlier. Defendant complained that the injury still hurt and that he had intermittent pain and difficulty in movement. After examination, Doctor Hamb found no objective evidence of injury.

The parties also stipulated that if Assistant State's Attorney Mark Fuller were called as a witness, he would testify that on September 1, 1987, he had a five-minute conversation with defendant. During this conversation, Fuller advised defendant that he was an assistant State's Attorney, and not defendant's attorney. Fuller further advised defendant of his *Miranda* rights, and defendant indicated that he understood. Fuller then had the brief conversation with defendant.

The State called Yvette Thomas, a receiving clerk for Cook County jail, as a rebuttal witness at the hearing. On September 2, 1987, Thomas completed a history and physical examination sheet for defendant. According to the sheet, Brock indicated that he did not have any injuries and that his health was generally good. Thomas did not note any bruises, cuts, swelling, sores or any marks on defendant's body.

The State also called Doctor Kaplan of the Psychiatric Institute as a rebuttal witness. Defendant objected, contending that he had not raised the issue of defendant's mental fitness to stand trial or sanity at the time of the offense; rather, he had only raised defendant's inability to understand *Miranda* warnings. The State maintained that it would not question Doctor Kaplan about fitness or sanity; rather, it would only inquire about the witness' opinion as to defendant's understanding of his constitutional rights. The judge overruled defendant's objection and permitted Doctor Kaplan to testify.

Doctor Kaplan testified that on May 3, 1989, the State requested him to examine defendant for three purposes; to wit: (1) fitness for

trial; (2) mental status at the time of the crime; and (3) defendant's understanding of his *Miranda* rights. Doctor Kaplan interviewed defendant for one hour. Prior to the interview, he reviewed the police reports concerning the offenses at issue; the court-reported statement signed by defendant; a psychological examination performed a few days prior by one of the staff psychologists at the Psychiatric Institute; Doctor Rosenwald's report; and a social history taken from defendant's father. Doctor Kaplan opined that within a reasonable degree of medical certainty and accuracy, defendant could understand the *Miranda* warnings on September 1, 1987. He based his opinion on the fact that defendant's intelligence tested as borderline and that he is not retarded; that his answers were responsive to questions and that defendant did not have any problem understanding him.

Doctor Kaplan discussed the *Miranda* warnings with defendant. He learned that defendant had been arrested as a juvenile on five separate occasions, and had been arrested twice as an adult prior to his arrest for the current offense. Also, defendant was a member of a street gang and was streetwise. Thus, the combination of defendant's intelligence above the level of retardation, prior arrest experience, and the fact that he considered him to be a streetwise individual led Doctor Kaplan to believe that defendant could understand his rights. He also noted that defendant was able to function in society, that he had fathered two children by different women, and that he maintained part-time employment. Doctor Kaplan concluded that defendant would have no trouble understanding the *Miranda* rights that were read to him.

The trial judge determined that defendant knowingly and intelligently waived his *Miranda* rights and that defendant was not physically coerced into making a statement. The judge noted that Doctor Rosenwald did not question defendant about his understanding of *Miranda* rights, but that Doctor Kaplan specifically asked defendant whether he understood those rights. Additionally, in each of defendant's seven prior arrests, *Miranda* rights were given and explained to him. Finally, defendant knew there was a possibility that he would need an attorney when the officer first asked him to come to the police station, as evidenced by the fact that defendant asked his mother to obtain a public defender at the time of the arrest.

Defendant also made a motion to sever the trial on the charges relating to the shooting death of Spivery from those relating to the armed robbery of Catchings and Pate. The trial court denied defendant's motion, finding there was continuous conduct and that the counts were related.

THE TRIAL

Robert Burns testified that on September 1, 1987, he was living at 2451 W. Jackson Boulevard, Chicago. Around 3 a.m., Burns saw the deceased jogging near the front of his house. As the deceased approached the front of Burns' home, he fell. Burns did not hear the report of a gunshot prior to the time that he saw the deceased.

Ernest Catchings, the victim of the armed robbery, testified that on September 1, 1987, at approximately 1:30 a.m., he was sitting in his car in a parking lot located at 2515 W. Jackson. Catchings heard a single gunshot. Catchings and Pate (since deceased) drove to the apartment building where they both resided, which was approximately one block away. As they exited the car, they were approached by two men running from the parking lot. Catchings and Pate had their hats turned to the left which indicated their membership in the Vice Lords gang, while the two men who approached them had their hats turned to the right, signifying that they were members of the Disciples. Catchings noticed that one of the men, later identified as codefendant Travis Fleming, was carrying a pair of tan shoes, and that the second man, whom he identified as defendant, was carrying a sawed-off rifle.

Fleming ordered Catchings and Pate to remove their hats. Fleming removed the jewelry Catchings was wearing, as well as his baseball cap and wallet. Pate removed his St. Louis Cardinals' baseball jacket and a gold chain. Fleming picked up the articles that Pate had removed. Defendant then walked over to Catchings and hit him in the eye. Thereafter, an individual in the apartment building yelled, and defendant and Fleming fled. Defendant's blue hat fell from his head. Catchings and Pate retrieved the hat and gave it to the police when they arrived a few moments later. Catchings later identified defendant and Fleming in a lineup.

Thomas Bachelder, an evidence technician assigned to the crime laboratory of the Chicago police department, testified that he and his partner arrived at the scene of the Spivery homicide at approximately 4:20 a.m. The victim was wearing socks without shoes, and his pockets were turned inside out.

Officer Mary Ann Perry of the Chicago police department testified that she was assigned to investigate the Spivery homicide. Perry estimated that she discovered the victim's body at approximately 1:30 a.m. Later that day, Perry received a phone call from Catchings asking whether she was investigating a murder in which the victim did not have any shoes. Catchings told her that early in the morning he had been with a friend. He heard a gunshot and moments later he was robbed by two men, one of whom he identified as Travis Fleming. Fleming was carrying a pair of men's shoes in his hand when he

approached Catchings and the other victim. Fleming's companion carried a sawed-off weapon.

Perry and two other detectives then went to Fleming's residence, and he and his mother agreed to accompany the detectives to the police station. After a conversation with Fleming, Perry sought defendant.

During cross-examination, Perry testified that she received the assignment at approximately 3 a.m., and that she arrived on the scene around 4 a.m. Perry further testified that Burns told her that the shooting had occurred between midnight and 1 a.m.

Pufpaf testified at trial to essentially the same sequence of events that he had previously stated at the motion to suppress. Upon arriving at the police station, defendant denied any knowledge of the Spivery homicide or the Catchings-Pate armed robbery. Fleming and defendant participated in a lineup with four other persons, and Catchings identified defendant as the man with the gun and Fleming as his companion. In a subsequent conversation with Fuller, defendant denied having any knowledge of the offenses.

Schreiber testified that after advising defendant of the *Miranda* rights, he took the following statement from defendant. On the night of the murder, Fleming approached him and asked whether he wanted to make some quick money. Defendant replied that he was interested. Fleming proposed that they rob a man in a building located across the street. Defendant borrowed a .22 sawed-off rifle from his brother-in-law. They approached a man dressed in beige clothing intending to rob him. Fleming searched the man's pockets and found nothing. Defendant told the man to take off his shoes and socks. Defendant told the victim to run, and when he got 10 feet away, defendant caught himself shooting at him. Defendant stated that he shot at the victim because he wanted to scare him. Immediately after the shooting, they ran across the street and saw two men, whom Fleming indicated that he knew. Defendant noticed that the men's hats were turned in a different direction from his hat. Fleming removed the man's jewelry and a St. Louis Cardinals' jacket. During the robbery, defendant had unzipped his jacket and had the gun at his side; however, it was not pointed at the man. He took $1.60 from the man's pocket. At the conclusion of the statement, defendant indicated that the police had treated him well, and that his swollen lip and stitches were the result of injuries sustained prior to his arrest.

Millicent Drower testified again at trial for defendant that he was academically retarded and had special difficulties with reading and comprehension. According to Drower, repeating an instruction would not necessarily help defendant's comprehension of a concept.

She described defendant as a student who persevered and wanted to improve. However, defendant often said that he understood a concept even when he did not.

Marlene Wolter, defendant's sixth- and eighth-grade teacher, also testified on his behalf at trial. Wolter testified that defendant was well below average academically and that he was severely learning disabled.

Doctor Rosenwald testified for defendant as an expert witness in the field of psychology. As testified to in the motion to suppress, Doctor Rosenwald evaluated defendant for 2½ hours and administered a number of psychological tests. Doctor Rosenwald found that defendant recognized words at the second-grade level, that he is borderline mentally retarded, and clearly retarded in the area of language. He did not discuss the *Miranda* warnings with defendant. According to Doctor Rosenwald, defendant suffered from a mental defect which was limited intellectual ability. Defendant's ability to answer judgmental questions was limited; thus, whenever there is a question of communication in which one has to be aware of variations or subtlety in meaning, defendant would be handicapped. Doctor Rosenwald testified that defendant would not understand the significance of the *Miranda* warnings.

The State called Doctor Kaplan as an expert witness in rebuttal over defense objection. He testified that he examined defendant pursuant to a court order on May 3, 1989. After reviewing all the material in his file, including psychological testing done by the staff psychologist, Doctor Kaplan found that defendant's intelligence quotient was 76, which placed him in the range of borderline intelligence.

Doctor Kaplan asked defendant specific questions about the *Miranda* warnings. He opined that defendant could understand the *Miranda* warnings. He based his opinion on the fact that while defendant's intelligence was in the below average range, he was not retarded. Also, defendant appeared to be streetwise, by virtue of the fact that he belonged to a gang, and he had prior familiarity with the criminal justice system. Further, defendant had fathered two children by different women, had lots of friends of both sexes, was able to use public transportation and had a part-time job. Doctor Kaplan went over the *Miranda* rights with defendant. Defendant stated that he understood them at that time; however, he did not on September 1 and 2, 1987.

Rosalind Lewis, defendant's ninth-grade teacher, testified that she taught defendant during the 1985-86 school year. Lewis stated that defendant was chronically absent from her class. Defendant was labeled as having a mild learning disability.

On appeal, defendant first assigns as reversible error the trial court's ruling which permitted Doctor Kaplan to testify, based upon his fitness examination of defendant, that he understood the *Miranda* warnings. As previously stated, the State contends that defendant placed his fitness for trial at issue by virtue of the examination and written opinion submitted by Doctor Rosenwald. The State further maintains that pursuant to section 104—11(a) (Ill. Rev. Stat. 1989, ch. 38, par. 104—11(a)), the issue of defendant's fitness for trial may be raised by the State, defendant or the court. Specifically, section 104—11(a) provides in relevant part:

> "The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial." Ill. Rev. Stat. 1987, ch. 38, par. 104—11(a).

■ The Code of Criminal Procedure of 1963 further provides that "[w]hen the issue of fitness involves the defendant's mental condition, the court shall order an examination of the defendant by one or more licensed physicians, clinical psychologists, or psychiatrists chosen by the court." (Ill. Rev. Stat. 1987, ch. 38, par. 104—13(a).) The use of statements made during such court-appointed evaluation is governed by section 104—14(a), as set forth below:

> "Statements made by the defendant and information gathered in the course of any examination or treatment ordered under Section 104—13 *** shall not be admissible against the defendant unless he raises the defense of insanity or the defense of drugged or intoxicated condition, in which case they shall be admissible only on the issue of whether he was insane, drugged or intoxicated." Ill. Rev. Stat. 1987, ch. 38, par. 104—14(a).

Defendant argues that section 104—14(a) operates as an exclusionary bar to the testimony elicited at trial by Doctor Kaplan because he did not raise the defense of insanity or drugged or intoxicated condition; rather, the only issue focused upon concerned defendant's comprehension of the *Miranda* warnings.

In *People v. Nicklaus* (1986), 147 Ill. App. 3d 632, 498 N.E.2d 753, this court also had occasion to interpret section 104—14(a). In *Nicklaus*, this court held that a psychologist who had been appointed to examine defendant to determine his fitness to stand trial should not have been permitted to testify at the sentencing hearing concerning statements made by defendant in the course of competency examinations where the defendant had never raised an insanity defense. The *Nicklaus* court held that the admission of such testimony, which included opinions that defendant had little regard for human life and would probably commit future criminal acts, was reversible error.

Defendant also relies upon the consolidated case of *People v. Kashney* (1986), 111 Ill. 2d 454, 490 N.E.2d 688, in which our supreme court specifically addressed whether or not the State, consistent with section 104—14(a), may introduce statements made by a defendant during a court-ordered psychiatric examination. Defendant Lee indicated in the pretrial phase of the proceedings that he *might* rely on the affirmative defense of insanity. The trial court then ordered a psychiatric examination to determine his fitness to stand trial. At trial, over defendant's objection, the State called the court-appointed psychiatrist. The prosecutor elicited from her an opinion based upon the information she had received during the examination. Our supreme court held that the exclusionary language of section 104—14(a) barred the introduction of such testimony, even for purposes of impeaching the defendant's psychiatrist. In light of the fact that defendant Lee had not raised the affirmative defense of insanity, the State was precluded from calling the court-appointed psychologist and eliciting from her statements made by the defendant during the examination.

However, our supreme court reached a different result under the factual circumstances presented in defendant Kashney's case. There, the defendant, who was charged with the murder and robbery of two victims, testified at trial in his own behalf that he had falsely confessed because of the pressure of satanic forces or demons which possessed one of the investigating officers who questioned him. The defendant presented the testimony of two self-styled experts in the field of demonology. The first witness testified as to the possible existence of demons, and the second expert testified that it was possible for a person to believe that another person is possessed by demons, and under such a belief, to respond with extreme fear.

The defendant also presented the testimony of two psychiatrists, Doctors Reifman and Goldsmith, both of whom had participated in defendant's court-ordered fitness examinations. Doctor Reifman testified that the defendant suffered from a schizophrenic reaction, paranoid type, which he described as a serious mental illness characterized by delusions based upon misinterpretation or misconception of reality. Doctor Goldsmith made a diagnosis of a chronic paranoid state, which he described as a mental illness characterized by false beliefs or illusions.

The defendant contended that the court erred when it allowed the State to question him concerning statements he made to psychiatrists who performed the court-ordered fitness examinations. Similar to the case *sub judice*, the defendant argued that in conducting such questioning, the State violated section 104—14(a)

(Ill. Rev. Stat. 1987, ch. 38, par. 104—14(a)), which operates as an exclusionary provision prohibiting the use at trial of any statements he made during his court-ordered fitness examinations unless he raised the affirmative defense of insanity.

Our supreme court reasoned that whether or not the defendant raised the affirmative defense of insanity was not the dispositive issue. Rather, the determinative issue is whether or not the defendant can claim any protection under section 104—14(a) where he introduced the substance of statements he made during his fitness examinations. The court concluded that defendant waived whatever protection might be afforded by section 104—14(a) by calling the court-appointed psychiatrists to testify in support of his claim that his confession was coerced by alleged demonic possession.

■ Applying this rationale to the present case, we find defendant's attempt to invoke the protection of section 104—14(a) to be unavailing under the circumstances. It is true that defendant did not present a defense of insanity or drugged or intoxicated condition as prescribed by section 104—14(a). Nonetheless, defendant attempted to demonstrate that his diminished mental capacity prevented him from comprehending the *Miranda* warnings. Toward this end, defendant offered the testimony of Doctor Rosenwald, who opined that defendant would have been unable to comprehend his *Miranda* rights despite repeated warnings. This testimony was bolstered by two of defendant's former grade school teachers.

The State then called Doctor Kaplan of the Psychiatric Institute as a rebuttal witness. Doctor Kaplan testified that he found that defendant could understand the *Miranda* warnings because his intelligence tested as borderline and he was not retarded, that he was a member of a street gang, and that he considered him to be streetwise. Doctor Kaplan also noted that defendant was able to function in society and use public transportation, that he had fathered two children by different women, and that he maintained part-time employment.

We find that, under the circumstances, the State was properly allowed the opportunity to rebut defendant's theory that his diminished intellectual capacity prevented him from comprehending the full import of his *Miranda* rights. In furtherance of his theory, defendant relied in part upon the testimony of Doctor Rosenwald. It follows, therefore, that fundamental fairness would require the State to be permitted the opportunity to rebut defendant's proffered testimony. As succinctly expressed in this court's opinion in *People v. Kashney* (1984), 129 Ill. App. 3d 218, 472 N.E.2d 164:

"We do not believe that in these circumstances the legislature

intended to preclude the State from also utilizing information and statements obtained during such examination in an effort to impeach the defendant. To rule otherwise would allow a defendant to commit perjury without the risk of being confronted with prior inconsistent statements." *People v. Kashney*, 129 Ill. App. 3d at 225, citing *United States v. Castenada* (7th Cir. 1977), 555 F.2d 605.

We also note that in *United States v. Banks* (C.D. Ill. 1991), 137 F.R.D. 20, the prosecution moved to perform psychological/psychiatric examinations upon a defendant intending to assert the defense that he suffered from "obstructive sleep apnea." The Federal district court analyzed Rule 12.2(c) of the Federal Rules of Criminal Procedure, which provides that "[i]n an appropriate case the court may *** order the defendant to submit to an examination pursuant to 18 USC 4241 or 4242." (Fed. R. Crim. P. 12.2(c).) Sections 4241 and 4242 address the court's authority to order the defendant to undergo psychiatric testing to determine his competency to stand trial or to determine the defendant's sanity at the time of the offense, and apply only to an insanity defense. (18 U.S.C. §§ 4241, 4242 (Supp. 1991).) The *Banks* court held that Rule 12.2(c), which allowed the prosecution to have its expert examine defendant to verify his defense of diminished mental capacity, authorized the court to order a psychiatric evaluation of a defendant who intends to rely on a mental incapacity defense other than insanity, despite the rule's reference to a statutory section explicitly limited to cases involving the insanity defense.

Defendant further argues that the trial court's conclusion that he knowingly and intelligently waived his *Miranda* rights and the denial of his motion to suppress was against the manifest weight of the evidence. Defendant correctly cites *People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958, for the proposition that a valid *Miranda* waiver must be knowing and intelligent, in addition to being free of coercion or other misconduct.

A reviewing court will not disturb a trial court's determination on a motion to suppress evidence unless it is against the manifest weight of the evidence. (*People v. Galvin* (1989), 127 Ill. 2d 153, 535 N.E.2d 837.) Whether a defendant intelligently waived his right to counsel depends, in each case, on the particular facts and circumstances of that case, including the defendant's background, experience, and conduct. (*People v. Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958, citing *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27.) Subnormal mental capacity alone does not render a confession involuntary, but it is a factor in determining the voluntariness thereof. *People v. Burke* (1987), 164 Ill. App. 3d 889, 518 N.E.2d 372.

■ The trial court conducted a thorough hearing on defendant's motion to suppress, which included the testimony of Detective Pufpaf, who was investigating the Spivery homicide and the Catchings-Pate armed robbery. Pufpaf interviewed defendant after he arrived at the police station accompanied by his mother and stepfather, and advised him of his *Miranda* rights. Defendant reviewed and initialed the bottom of each page of the statement prepared by Assistant State's Attorney Schreiber. We also note that Schreiber made several changes in the text of the statement at defendant's request.

The judge also heard the testimony of Doctor Rosenwald and two of defendant's teachers who offered their opinions concerning defendant's intelligence. We also consider the fact that defendant knew there was a possibility that he would need an attorney when he arrived at the police station, and that he was able to discern the differences between a private attorney versus a public defender. Too, defendant had been arrested on seven prior occasions, and *Miranda* rights were given to him in each instance. We note that Yvette Thomas, the receiving clerk at Cook County jail, testified that defendant did not have any injuries, and that she did not note any bruises, cuts or abrasions on defendant's body. The parties' stipulation concerning the testimony of Doctor Aaron Hamb also indicated that he found no objective evidence of the injuries allegedly sustained by defendant during his interrogation.

Upon review of the evidence, we will not disturb the trial court's denial of defendant's motion to suppress statements.

Defendant next contends that the trial court improperly refused to sever the charges relating to the Spivery murder from those arising from the Catchings-Pate armed robbery. Defendant contends that the two crimes were separate and distinct and were not part of the same comprehensive transaction, and that he was prejudiced by the joinder of these two offenses at trial.

The joinder of related prosecutions is governed by section 114—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 114—7), which provides that separate offenses may be joined if they are part of the same comprehensive transaction.

■ The trial court did not abuse its discretion in refusing to sever the Spivery murder charge from the Catchings-Pate armed robbery. The court found that there was a pattern of continuous conduct in the commission of the murder and the armed robbery. In defendant's statement, he admitted that after they robbed and shot Spivery, they went across the street where they happened upon Catchings and Pate and committed the armed robbery. Thus, the two offenses occurred within minutes of each other and a block away by the

defendant's own account. In addition, Catchings testified that Fleming was carrying a pair of beige shoes while defendant wielded the sawed-off rifle, which lends further support to the theory that the offenses were part of the same continuous transaction.

Defendant further contends that the trial court erred in admitting the hearsay testimony of Detective Pufpaf that Pate identified defendant in a lineup. Defendant also challenges the testimony of Officer Mary Ann Perry that Robert Burns told her that he saw the victim running and falling between midnight and 1 a.m.

The State counters defendant's argument by asserting that such testimony was limited to the investigatory means by which defendant was apprehended and arrested, and was therefore admissible. In *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, our supreme court held that it is permissible for an officer to testify to what he did during the course of an investigatory procedure; however, the introduction of the substance of the conversation is objectionable as hearsay. More recently, in *People v. Johnson* (1990), 202 Ill. App. 3d 417, 559 N.E.2d 1041, this court also held that the testimony of the police officers that other parties had identified the defendant as being involved in a burglary was error despite the State's contention that it explained police procedure.

■ Arguably, Pufpaf's testimony concerning the fact that Pate, who was deceased at the time of trial, had identified defendant and Fleming in a lineup can be considered as information obtained during the course of an investigation. No specific detail of the conversation that accompanied the lineup was elicited at trial. Accordingly, we find that it was proper to admit the lineup identification testimony to establish the officer's actions relating to the investigation.

However, the introduction of Perry's testimony concerning the statement that Burns made to her concerning the time that the shooting occurred was error, in view of the fact that Perry testified as to the specific details rather than simply what she did during the course of that investigation. Nonetheless, such an evidentiary error can be labeled harmless if properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant. *People v. Carlson* (1982), 92 Ill. 2d 440, 442 N.E.2d 504.

In the present case, we do not find that the evidence was so closely balanced that the admission of Perry's testimony would have produced a different result at trial. In his own statement, defendant related the sequence of events which occurred prior to and immediately following the shooting of the victim. Catchings also testified that he heard a single gunshot prior to the time that he and Pate

encountered defendant and Fleming. Thus, it appears that while Perry's testimony may have been improper, sufficient other corroborative evidence existed to support the jury's determination of defendant's guilt.

■ Finally, we find that the trial court properly refused the involuntary manslaughter instruction. This murder occurred during the commission of a forcible felony, and there was no evidence offered to support an involuntary manslaughter instruction.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI, J., concurs.

PRESIDING JUSTICE EGAN, specially concurring:

I concur specially to express my view that the State's right to have the defendant examined by a psychiatrist of the State's choosing is grounded on common law precedent and is not dependent on any statute. There is substantial case law to support the proposition that a court has inherent power to order a party to submit to a mental or physical examination whenever a party puts his mental or physical condition in issue.

In *People v. Scott* (1927), 326 Ill. 327, 157 N.E. 247, a defendant was sentenced to death, and a subsequent hearing was conducted to determine whether he had become insane. If he had become insane, his execution would have been barred. The supreme court held that it was error to permit the State's Attorney to comment on the defendant's refusal to submit to an examination.

*People v. Scott* was expressly overruled in *People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288, 139 N.E.2d 780, in which the trial judge ordered a plaintiff in a personal injury action to submit to a physical examination. The plaintiff filed an original petition in *mandamus* in the supreme court for an order directing the judge to expunge the order that he had entered. The supreme court denied the petition with these observations:

> "Yet Wigmore's classic treatment of the problem (Wigmore, Evidence, 3rd ed., sec. 2220) makes it clear that the *common law*, from earliest times, permitted and required physical examinations where they were necessary. And other courts have recognized *an inherent power to require them when the ends of justice require.* [Citations.]

\* \* \*

The other explanation is that the doctrine of 'lack of power' may have been a shorthand way of saying that the court felt that it was appropriate for the legislature, and not the courts, to determine that such examinations should be permitted. [Citation.] This view, however, ignores *the common-law precedents* that permitted physical examination where necessary, and it overlooks the power of our courts to regulate judicial procedure. [Citations.]" (Emphasis added.) 10 Ill. 2d at 292-93.

In *People v. Carpenter* (1957), 11 Ill. 2d 60, 142 N.E.2d 11, the supreme court affirmed the defendant's conviction and death sentence. His sister then filed a petition alleging that he had become insane since the sentence of death and, therefore, could not be executed. The trial judge allowed her motion that a physician of her choice be permitted to examine the defendant for a psychiatric evaluation. Over the objection of the petitioner, the judge also allowed the State's motions to permit three psychiatrists to examine the defendant. After the defendant's psychiatrists testified, the State's psychiatrists testified before a jury which found that the defendant was sane. The supreme court rejected the petitioner's claim that permitting the State psychiatrists to examine the defendant and to testify violated due process. (*People v. Carpenter* (1958), 13 Ill. 2d 470, 150 N.E.2d 100.) The court relied upon *People ex rel. Noren v. Dempsey*. In doing so, the court recognized that in *People ex rel. Noren v. Dempsey*, the examination was for discovery purposes and in *Carpenter*, the examination was for evidentiary purposes. The court said that distinction was not controlling. (*Carpenter*, 13 Ill. 2d at 478.) The court concluded:

"In the present case Irene Carpenter by her petition placed in issue the mental condition of Richard Carpenter. His mental condition, therefore, became a fact to be proved in the case and an examination by the State was therefore proper. We find that the order directing the warden to permit Carpenter to be examined by a State psychiatrist did not violate Carpenter's privilege of privacy and did not deprive him or petitioner of due process of law." 13 Ill. 2d at 477.

In sum, I believe that the statute which is argued here is irrelevant. Fundamental fairness should permit the State to have a fair chance at rebutting expert testimony that the defendant will offer. I agree with the State's argument that to permit the defendant to present testimony regarding his ability to comprehend his rights with no possible response from the State would defy "any standard of equity that is embedded in our adversarial system of law."

In keeping with the spirit of section 104—14(a) and *People v. Kashney* (1986), 111 Ill. 2d 454, 490 N.E.2d 688, I would not permit

the State's examining physician to testify unless the defendant had first presented evidence on the issue of his fitness to understand *Miranda* warnings. In this case the defense did present evidence on the question and, consequently, opened the door for the State's evidence.