THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID RANDLE, Defendant-Appellant.

First District (1st Division)   No. 1—93—0949

Opinion filed December 29, 1995.—Rehearing denied March 5, 1996.

Charles H.R. Peters and Daniel S. Brennan, both of Schiff, Hardin & Waite, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara L. Jones, and Gael McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

After a jury trial, defendant David Randle was convicted of first degree murder, armed robbery, and felony murder. Defendant was sentenced to serve 100 years in the Illinois Department of Corrections.

## ISSUES PRESENTED FOR REVIEW

Defendant presents the following issues for review: (1) whether defendant was deprived of the effective assistance of counsel; (2) whether the trial court committed reversible error by refusing to answer the jury's questions during deliberations; (3) whether the trial court erred in refusing to quash the warrantless arrest of the defendant; (4) whether the trial court should have suppressed the defendant's statements; and (5) whether the prosecution failed to prove the offense of armed robbery, as charged in the indictment, beyond a reasonable doubt.

We affirm.

## FACTS

### THE MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS

The defendant took the stand at a hearing on his motion to quash his arrest and suppress his statements. He testified that at approximately 10 p.m. on January 4, 1991, the police knocked on the door to his trailer. His brother Frank answered. The police asked for defendant. After Frank said defendant was present, the police entered. Neither Frank nor the defendant invited the police into the trailer. The brothers were handcuffed and taken to the police station.

The parties stipulated that there was no warrant for defendant's arrest.

Detective James Boylan testified that on December 18, 1990, he arrived at the home of Sophie Lorek. He found Sophie slumped against the kitchen wall. There was a butcher knife at her feet and a

pool of blood around her. Blood was splattered on the floor, kitchen table, and refrigerator. The front doors of the house were locked from the inside. The rear door was open and ajar. The bedroom window was broken. Broken glass was on the window sill, undisturbed. A dresser drawer had been removed. Towels were stuffed in the ceiling light, and a blanket hung over the broken window. Small amounts of change were scattered on the kitchen table and in the bedroom area. Based on the physical evidence, Detective Boylan did not believe it was possible for someone to enter the house through the window.

Detective Boylan learned from the victim's neighbors that the victim always carried a snub-nose colt revolver. He also learned that the victim was very cautious. She kept her doors locked and would only allow people she knew into her home. Mrs. Jones, one of the victim's neighbors, told the officer that Sophie often hired defendant to do odd jobs. Mrs. Jones also told Detective Boylan that she had last seen the defendant at the victim's home on Friday, December 14. The reports differed as to the last time anyone saw the victim alive.

Detective Boylan learned of an interview other officers had with defendant on December 21, 1991. Defendant told police that he had mowed the victim's lawn a couple of times, but he had not been at the victim's house since the summer of 1990. Defendant's criminal history revealed defendant had been convicted of robbery and burglary. He was presently on parole.

Prior to defendant's arrest, Detective Boylan had conversations with certain anonymous individuals. The police received a large number of calls that defendant was attempting to sell a snub-nose revolver in the neighborhood of the victim's home.

The police also received a report from Officer Tillman, a Chicago police sergeant on leave. Tillman told Detective Boylan that her son told her the defendant was attempting to sell a snub-nose revolver to boys in the neighborhood and that defendant had approximately $1,000 in cash on him.

Based on the information he received, Detective Boylan went to the defendant's home. The officer knocked on the door and defendant came out. Defendant was placed under arrest.

The trial court found the police had probable cause to arrest the defendant.

On a subsequent court date, defendant was allowed to reopen the hearing on the motion. Paula Tillman testified that her only son was not in Chicago in December 1990 or January 1991. Tillman denied that she had told the police her son had any knowledge of the murder.

Detective Boylan and Beverly Draper, a police dispatcher's aide, both testified that they had a conversation with Tillman and that Tillman said that her son told her defendant was attempting to sell a handgun and that defendant had $1,000 in cash. After Draper spoke with Tillman, Draper called Area 2 and told Detective Binkowski what she had learned. Detective Binkowski testified to his conversation with Draper.

Tillman's testimony, which was contradicted by the testimony of Draper, Detective Boylan, and Detective Binkowski, did not change the court's previous ruling. The court found that Tillman had made the statements to Draper and Detective Boylan.

## THE MOTION TO SUPPRESS STATEMENTS

At approximately 10:50 p.m. Detectives Boylan and McDermott began interrogating the defendant in an interview room at Area 2 headquarters. Detective Boylan said he read defendant his rights, and, when asked, the defendant stated that he understood those rights. Defendant was interrogated for 10 to 15 minutes before the detectives left the interview room. During this period of questioning, the defendant denied any knowledge of what happened to Sophie. Detective Boylan testified that defendant stated on the evening of December 14, 1990, he had gone to a motel with his brother Frank and two girls. Defendant said he paid for the motel room in cash.

Detectives Basile and Wilkins spoke with defendant at Area 2 while Detectives Boylan and McDermott were at 11th and State Streets headquarters with Frank Randle, defendant's brother. At one point, Detective Wilkins left the room. While alone with Detective Basile, defendant made an admission that he was at Sophie's home on the night of the murder.

Detectives Boylan, Basile, and McDermott interviewed defendant for the third time that night. The felony review unit of the State's Attorney's office was called. Assistant State's Attorney (ASA) Dorothy Matthews came to the police station. Detective Boylan, ASA Matthews, and Detective Basile again interviewed the defendant. ASA Matthews advised defendant of his rights and the fact that she was an attorney working with the police. ASA Matthews reduced defendant's statement to writing and reviewed it with him. Defendant signed the statement, as did ASA Matthews, Detective Boylan, and Detective Basile.

Detective Boylan, Detective Basile, Detective McDermott, and Detective Wilkins all testified that they never employed either physical or psychological coercion on the defendant in order to get him to speak. Detective Basile said he never grabbed defendant by the

testicles. ASA Matthews testified that defendant did not appear injured when she spoke to him. Defendant never complained to ASA Matthews of any physical abuse and never said he was in need of medication.

Officer McDermott was not aware that defendant had any seizure medication with him when he was arrested. Defendant never told him that he had a seizure disorder and had medication for the disorder.

Defendant testified that he was asleep in the trailer when four police officers came and knocked on the door, asking for him. Defendant got dressed. He and his brother were taken to the police station, where he was handcuffed to the wall in an interview room. Defendant had his wallet with him. He also had Dilantin, which he took for seizures, in his pocket.

Detective Boylan and another detective came in and started asking him questions about Sophie Lorek. The detectives left the room. After 20 to 30 minutes, Detectives Basile and Wilkens came in and began questioning defendant. The detectives told defendant that Frank had already said defendant "did it." Defendant was left alone in the room with Detective Basile.

Defendant's Dilantin was on the table in a plastic bag. Detective Basile dropped the bag on the floor and stepped on it. Defendant told Detective Basile that he needed the medication because he had not taken it yet that day and he was supposed to take it three times a day. He had last taken his medication at 8 p.m. Detective Basile grabbed defendant by the testicles and kept squeezing until defendant said that he stabbed Sophie.

After the assistant State's Attorney left, defendant told the police he needed to take his medication. The police took defendant to Roseland Community Hospital. The emergency room doctor gave him Dilantin.

Defendant said he did not read his statement before he signed it. The assistant State's Attorney read it to him. The statement contained in the confession that said he was treated well by the police was not there when he signed the confession. Defendant said he told the doctor at the Cook County jail that his testicles were hurting.

The parties stipulated that, if called to testify, Dr. Anthony Alexander would testify that he was employed at Roseland Community Hospital as an emergency room physician on January 5, 1991. Dr. Alexander saw defendant and approved defendant receiving his own Dilantin.

The parties also stipulated that the "bruise sheet" contained no

record of any complaint by the defendant that his testicles hurt or were injured.

The trial court denied the motion to suppress. The court found the defendant to be unbelievable when he said that the statement regarding his treatment was not on the confession when he signed it. The court noted the continuity of the document. The defendant's signature was underneath the clause concerning treatment. The court found that defendant had the opportunity to complain to Dr. Alexander, but there was no evidence that he had done so.

The court noted that four officers testified they did not remember any medication. However, the court knew the medication was present someplace, because defendant was later given his own medication. There was no evidence that the medication was crushed or broken. The court did not believe the defendant's allegations of brutality or that his medication was kept from him.

## THE TRIAL

Bruce Robbins testified that he had known Sophie Lorek since 1968. Sophie lived directly across the street from his business. Sophie acted as a night watchman and would "keep an eye on the place" for $110 a week. Sophie owned a short-barreled handgun.

On December 14, 1990, Robbins asked a mutual friend to drop the envelope containing Sophie's pay in her mailbox. The envelope contained cash. On December 17 and 18, the mailman told Robbins that he was unable to deliver Sophie's mail because her screen door was locked. On both days, Robbins tried to call Sophie, but her line was busy. On December 18, Robbins went to Sophie's house to investigate. He discovered the window was broken. He looked in the window and saw Sophie's body. He called the police.

Lillie Jones, one of the victim's neighbors, testified she had seen defendant in the neighborhood the weekend before she learned of Sophie's death.

Officer Lisa Thoren testified that on December 18, 1990, she went to the victim's house. She spoke with Robbins. The back door was ajar. Officer Thoren's description of the scene was substantially the same as described in Detective Boylan's testimony at the motion to quash arrest.

Detective Boylan went to Sophie's home on December 18, 1990. Boylan described the scene as he had during the hearing on the motion to quash arrest. He found change and money wrappers on the kitchen table, the kitchen floor, and in the bedroom.

Through a gun check, Boylan determined the victim owned a Colt .38 revolver. This gun never was recovered. Boylan arrested defendant and took defendant and his brother Frank to Area 2.

Initially, said Boylan, defendant denied any knowledge of the murder. During a second interview, defendant told the officers he had been at Sophie's house in the evening hours of December 14, 1990, fixing a toilet. At the time, Sophie was having a heated telephone conversation. She pulled the telephone receiver from the wall. When defendant emerged from the bathroom, Sophie was waving a large wooden-handled kitchen knife at him. Defendant shoved Sophie. He saw blood dripping from underneath her pajamas. Sophie slumped to the floor. Defendant grabbed the revolver off the bedroom dresser and fled from the house through the front door.

Defendant gave ASA Matthews the same statement he had given Detective Boylan and Detective Basile. ASA Matthews confronted defendant with the fact that the victim had been stabbed several times. Defendant then admitted that he stabbed Sophie more than one time, but he was unable to recall exactly how many times. Defendant got a gun from the victim's dresser, left by the back door, and broke the back window so that it would look like someone had broken into the home. Defendant agreed to sign a handwritten statement. ASA Matthews prepared a summary of her conversation with the defendant. Before signing the statement, defendant read the statement over and said there would be no corrections. Defendant read the statement out loud to ASA Matthews so she could make sure defendant could read English.

The medical examiner testified that the victim received three stab wounds to the chest and one slash wound to the neck. The victim died as a result of the stab wounds. The medical examiner was unable to determine the date of death.

In defendant's written statement, defendant acknowledged his rights and said he understood them. Defendant had done odd jobs for the victim for a number of years. On December 14, 1990, at 5:30 p.m., defendant went to the victim's home to fix her toilet. He wore rubber gloves. When he arrived, the victim was engaged in a loud telephone conversation. The victim became upset and pulled the receiver out of the wall. She grabbed a knife with a six-inch blade and wooden handle and began to wave it. In an attempt to grab the knife, defendant pushed her. He grabbed the knife from the victim's hand and stabbed her more than once. The victim fell to the floor. Defendant got scared and went out the back door. He threw a brick through the window to make it look like someone broke in and then left. Before leaving the victim's home, defendant took a gun off the dresser. Defendant was treated well by the police.

During deliberations, the jury sent the judge a note. The time was 7:45 p.m. The note said:

"We have a question regarding mitigating circumstances.

1. Can we use statement [*sic*] supplied by the prosecution in establishing mitigating circumstances?

2. Or are we required to use information only supplied by the defense to establish mitigating circumstances.

3. How can the defense establish mitigating circ. [*sic*] without incriminating their client??"

The trial judge, Judge Hett, was unavailable. Both parties appeared before Judge Egan.

At 8:05 p.m., Judge Egan responded in writing: "You have been given your instructions. Please reexamine them. Judge Hett will be back shortly." At 8:45 p.m., the jury returned a verdict of guilty on the armed robbery count and the murder counts.

At the sentencing hearing, defendant presented the testimony of Dr. Robert Wilson, a clinical neuropsychologist. Dr. Wilson testified that defendant had an IQ of 69, which is in the mentally retarded range. Dr. Wilson felt defendant suffered from perceptual abnormalities, attention deficit problems, and a lifelong learning disability. Dr. Wilson interviewed defendant, examined him, and reviewed defendant's medical records from his 1990 hospitalizations. In 1990, defendant had been hit over the head with a baseball bat and received severe injuries. Dr. Wilson concluded that defendant suffered from organic brain syndrome or massive brain damage. Dr. Wilson believed that defendant was not mentally retarded prior to his head injury.

The trial court sentenced defendant to an extended term of 100 years' imprisonment.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel fell below the objective standard of reasonableness in two respects: (1) the failure to call Dr. Robert Wilson or any other mental health professional at the hearing on the defendant's motion to suppress or at trial; and (2) the failure to call the doctor from Cook County jail as a witness at the suppression hearing.

■ To prevail on a claim of ineffective assistance of counsel a defendant must meet both prongs of the *Strickland* test. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) "The *Strickland* test requires that the defendant show that counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance resulted in prejudice to defendant." (*People v. Robinson* (1995), 167 Ill. 2d 397, 405.) The failure to satisfy either prong is fatal to a claim of ineffective assistance of counsel. *Robinson*, 167 Ill. 2d at 405, citing *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

"A court measures counsel's performance by an objective standard of competence under prevailing professional norms." (*People v. Mahaffey* (1995), 165 Ill. 2d 445, 458, 651 N.E.2d 174.) To establish that counsel was deficient, the defendant must overcome the strong presumption that the challenged action or lack of action might be the product of sound strategy. *Mahaffey*, 165 Ill. 2d at 458.

## A. FAILURE TO CALL A HEALTH CARE PROFESSIONAL

Defendant argues that trial counsel's failure to raise the issue of defendant's mental capacity at the motion to suppress constituted ineffective assistance of counsel.

> "Subnormal mental capacity alone does not render a confession involuntary, but it is a factor in determining the voluntariness thereof." *People v. Brock* (1992), 262 Ill. App. 3d 485, 498, 633 N.E.2d 735, 743.

At the sentencing hearing Dr. Wilson testified that defendant's IQ placed him in the mentally retarded range. However, Dr. Wilson did not offer any opinion as to whether defendant had the ability to understand his *Miranda* rights when they were presented. Dr. Wilson was neither asked for, nor did he offer, an opinion regarding defendant's fitness to stand trial.

Prior to sentencing the defendant, the trial court concluded that Dr. Wilson's testimony did not raise an issue of defendant's fitness to be sentenced. The trial court commented that there had been "no apparent evidence of any type of inability of Mr. Randle to appreciate the nature of the charges that were brought against him in connection with this death; nor that there has been any indication previously; nor at this time that the defendant was unable to cooperate with his attorney."

■ "Competence to waive counsel is measured by the same standard as competence to stand trial." (*People v. Mahaffey* (1995), 166 Ill. 2d 1, 19, 651 N.E.2d 1055.) A defendant is considered unfit to stand trial if, due to a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. *People v. Coleman* (1995), 168 Ill. 2d 509, 524.

> "Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas. [Citation.] A person can be fit for trial although his mind may be otherwise unsound." *Coleman*, 168 Ill. 2d at 524.

In *People v. Mahaffey*, defendant argued on review that his trial counsel was ineffective when he failed to investigate and introduce evidence at a suppression hearing that defendant was "mentally retarded" and, consequently, incapable of understanding his *Miranda* warnings.

In support of his argument, Mahaffey relied on an affidavit by a clinical psychologist who had examined him. The psychologist opined Mahaffey had a very low intelligence and a "borderline personality disorder." He further opined that it was "highly probable that [defendant] could not understand his *Miranda* rights." (*Mahaffey*, 165 Ill. 2d at 462.) The supreme court concluded that the introduction of this evidence at the suppression hearing would not have created a reasonable probability that defendant's motion to suppress would have been granted. The supreme court stated:

> "Evidence of a defendant's limited intellectual capacity, by itself, does not indicate that a defendant is incapable of waiving his or her constitutional rights and making an inculpatory statement. This is only one factor to be considered in the totality of the circumstances under which the statement was made. [Citation.]
> ***
> *** Thus, where the record shows that a defendant's subpar intellectual capacity does not interfere with his or her ability to comprehend the meaning of *Miranda* warnings, the defendant's inculpatory statements will not be suppressed." (*Mahaffey*, 165 Ill. 2d at 462-63.)

The supreme court held that the trial court was in the best position to evaluate defendant's ability to understand his rights, and that even if trial counsel had presented evidence of defendant's limited intellectual capacity, the trial court need not have accepted the psychologist's conclusions. *Mahaffey*, 165 Ill. 2d at 463.

"Generally, the decision to call a witness to the stand is a matter of trial strategy." (*People v. Sims* (1995), 167 Ill. 2d 483, 520.) The ultimate issue of fitness is for the trial court, not the experts, to decide. (*Coleman*, 168 Ill. 2d at 525.) The mere fact that a psychiatrist expresses the opinion that the defendant was unfit does not require a similar finding by the trial court; it is the trial court's function to assess the credibility and weight to be given to psychiatric expert testimony. *Coleman*, 168 Ill. 2d at 525.

■ The trial judge heard Dr. Wilson's testimony regarding defendant's intellectual capacity and found that it did not impede his ability to understand the proceedings. The trial judge had the opportunity to observe the defendant from the pretrial stage of the proceedings through sentencing. The judge was aware of defendant's previous contacts with law enforcement. Dr. Wilson found that defendant had a low IQ. Dr. Wilson did not make any findings as to defendant's ability to understand and waive his rights pursuant to *Miranda*. Dr. Wilson's testimony did not raise a question of defendant's fitness or his ability to understand the legal proceedings.

Defendant has failed to demonstrate that he has suffered any prejudice as a result of counsel's decision. (See *People v. Foster* (1995), 168 Ill. 2d 465.) Defendant cannot prove that the outcome probably would have been different had this testimony been presented.

## B. FAILURE TO CALL DOCTOR FROM COOK COUNTY

Prior to trial, trial counsel filed a motion to suppress the statements defendant gave to police while in custody. Trial counsel asserted, *inter alia*, that the statements were obtained through coercion and were, therefore, involuntary.

Defendant testified at the suppression hearing that the lingering pain from Detective Basile's physical mistreatment prompted a complaint to a doctor from Cook County jail. Defendant claims the testimony of this unnamed doctor would corroborate his story.

■ Defendant contends trial counsel's failure to call defendant's treating physician at Cook County jail, a witness who could corroborate his story of physical abuse, amounted to ineffective assistance of counsel. However, defendant presents no evidence to support this speculation. There is no evidence, other than defendant's claim, that the doctor even exists. Defendant has failed to satisfy either prong of the *Strickland* test.

## II. JURY'S QUESTIONS DURING DELIBERATIONS

■ Defendant contends the trial court failed to properly respond to questions from the jury regarding mitigating circumstances.

During deliberations, the jury sent out a set of three questions requesting clarification on the evidence the jury could consider for mitigating circumstances. Judge Egan told the jury to reexamine the instructions it had been given. Forty minutes later, the jury returned a verdict of guilty on the murder, felony murder, and armed robbery counts.

The jury was instructed on both murder and felony murder. The instructions on murder allowed the jury to find the defendant guilty of the lesser included offense of second degree murder if it found a mitigating factor was present. (See Illinois Pattern Jury Instructions, Criminal, Nos. 2.03A, 7.06A (3d ed. 1992).) These instructions told the jury it could consider "all of the evidence in the case" in deciding whether a mitigating factor was present. The instructions on felony murder did not permit the jury to find defendant guilty of second degree murder. See Illinois Pattern Jury Instructions, Criminal, Nos. 7.01A, 7.02, 7.02X (3d ed. 1992).

The order of sentence and commitment reflects that defendant was sentenced only on the felony murder count. (720 ILCS 5/9—

1(a)(3) (West 1992).) The jury, properly, was not permitted to consider mitigating circumstances in finding the defendant guilty of felony murder.

Since defendant was sentenced only on the felony murder charge, it is not necessary to address the merits of this argument.

## III. MOTION TO QUASH ARREST

Defendant contends that the trial court erred in denying his motion to quash arrest.

A person may be arrested without a warrant when a police officer has reasonable grounds to believe that the person has committed a crime. (725 ILCS 5/107—2(1)(c) (West 1992).)

> "A warrantless arrest will be deemed lawful only when probable cause to arrest has been proven. [Citation.] Probable cause to arrest exists when facts exist that would lead a reasonable person standing in the shoes of the police officers to conclude that a crime had been committed and the defendant was the person who committed the crime. [Citation.] Courts, guided by common sense and practical considerations, must determine whether probable cause existed based on the facts known to the officers at the time the arrest was made." *People v. Robinson*, 167 Ill. 2d at 405.

A review of all the evidence presented at the hearing establishes that the evidence known to the arresting officers at the time of arrest supported a finding of probable cause.

The police believed that a forced entry had been staged to cover up the fact that the victim knew her assailant and allowed him entry. Defendant had been employed to do odd jobs around the victim's home. When defendant was asked when he last saw the victim, he lied. Defendant told police officers that he had last been at the victim's home in the summer. Mrs. Jones told Officer Boylan that she had last seen defendant at the victim's home on December 14. The victim's gun was missing. The police had received reports that defendant was trying to sell a gun in the neighborhood and he was carrying large amounts of cash.

A reviewing court will not disturb the trial court's finding of probable cause on review unless it is manifestly erroneous. (*People v. Williams* (1995), 275 Ill. App. 3d 249, 253, 655 N.E.2d 1071.) Defendant has failed to show that the trial court's finding is against the manifest weight of the evidence.

## IV. MOTION TO SUPPRESS STATEMENTS

Defendant contends that the trial court erred in denying his motion to suppress his statement.

Once defendant asserts that a confession is coerced, it is the

State's burden to establish by a preponderance of the evidence that the confession was voluntary. *People v. Caballero* (1984), 102 Ill. 2d 23, 33, 464 N.E.2d 223, 227.

To determine voluntariness of statements, the court may consider the age, intelligence, experience, and physical condition of the defendant, the length of interrogation, and the existence of threats, promises, or physical coercion. *People v. Williams* (1995), 275 Ill. App. 3d 249, 655 N.E.2d 1071.

The trial court conducted a hearing on defendant's motion to suppress.

Four police officers testified that defendant was not physically or psychologically coerced. ASA Matthews testified that defendant never complained of any abuse.

■ The court ruled that defendant's claims of physical abuse were not believable since he never told anyone about the pain and did not seek treatment. The "bruise sheet" indicated that defendant had not complained about his testicles. Defendant did not complain to ASA Matthews. He signed a statement that he had been treated well by the police. The court found that defendant's claim that Detective Basile denied him medication or stepped on his medication had no factual basis, as the testimony proved that his medication was not even in the interview room and that the detective did not know he had medication. Testimony also showed that when defendant went to Roseland Hospital, the doctor gave defendant his own Dilantin and there was no evidence that the pills were crushed. No evidence was presented that the lack of Dilantin had any effect on the defendant.

The trial court heard the defendant and had the opportunity to observe him. The trial court's finding on the motion to suppress is supported by the evidence in this case.

## V. ARMED ROBBERY CONVICTION

Defendant contends the State failed to satisfy its burden of proving the offense of armed robbery beyond a reasonable doubt. The indictment charged the defendant with armed robbery in that he "by the use of force and by threatening the imminent use of force while armed with a dangerous weapon, took United States currency."

■ The failure to prove a material allegation of an indictment beyond a reasonable doubt is fatal to a judgment of conviction. (*People v. Walker* (1955), 7 Ill. 2d 158, 163, 130 N.E.2d 182, 183.) The elements of armed robbery may be proved by circumstantial evidence. (*People v. Williams* (1987), 118 Ill. 2d 407, 415, 515 N.E.2d 1230.) The habit or custom of receiving cash and keeping it in her home is properly admitted as circumstantial evidence that the victim had

money in her home at the time of her death. (*People v. Keller* (1994), 267 Ill. App. 3d 602, 641 N.E.2d 891.) "A defendant's taking of property may be inferred from the circumstance that money or property is no longer in the place where it is habitually placed." *People v. Wiley* (1995), 165 Ill. 2d 259, 297, 651 N.E.2d 189.

■ Sophie was paid in cash shortly before her death. Her dresser drawer had been removed and empty money wrappers were found in the kitchen and bedroom. Reviewing the evidence in this case in the light most favorable to the State, there is sufficient evidence from which the jury could have reasonably found the defendant guilty of armed robbery beyond a reasonable doubt. See *People v. Enis* (1994), 163 Ill. 2d 367, 400, 645 N.E.2d 856.

■ Defendant also argues that there was a fatal variance between the indictment and the jury instructions on the armed robbery charge. The indictment charged defendant with taking currency. The jury instructions charged defendant with taking property. To require reversal, a variance, if there is one, must be material and of such character as to mislead the accused in making his defense or expose him to double jeopardy. *People v. Maxwell* (1992), 148 Ill. 2d 116, 135, 592 N.E.2d 960, 970.

There is no fatal variance in this case.

CONCLUSION

For all the reasons set forth above, we affirm the judgement of the trial court.

Judgment affirmed.

BUCKLEY and BRADEN, JJ., concur.