THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HILTON KELLER, Defendant-Appellant.

First District (6th Division)    No. 1—92—2203

Opinion filed October 7, 1994.

Rita A. Fry, Public Defender, of Chicago (Cary M. Berman, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Christopher B. Kaczynski, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

A jury found the defendant, Hilton Keller, guilty of the first degree murder and attempted armed robbery of Ollie Jones. The judge sentenced the defendant to concurrent imprisonment terms of 70 years for murder and 15 years for attempted armed robbery. He first contends that he was not proved guilty beyond a reasonable doubt of either offense.

The deceased, nicknamed O.B., owned a variety store at 1940 West 69th Street in Chicago. On May 15, 1991, at about 5:30 p.m., Rashim Black, who had several criminal charges pending against him in juvenile court at the time he testified for the State, went to O.B's store and started playing a video game. No one was in the store except O.B. and Black. About 15 minutes later, the defendant, whom Black knew by the nickname "Dooley," came into the store. Black had associated with the defendant for about a year and a half. The defendant told Black he needed some money. Black told him he did not have any. O.B. started yelling at the defendant to get out of the store. When the defendant answered with obscene language, O.B. unlocked the counter door and walked toward the defendant. As O.B. approached him, the defendant left the store. Black continued to play video games and then left to go next door to a store owned by William Jones. Black stayed at Jones' store for approximately two hours.

Black returned to O.B.'s store and played pinball. While Black was playing, the defendant returned and began arguing with O.B. Black saw the defendant pull out a long black gun and hold it down by his right side so that it was concealed from O.B.'s sight. Because he was frightened, Black left O.B.'s store and went to Jones' store. Approximately $2^1/2$ minutes later Black heard gunshots. Black then saw O.B. in the street bleeding from his stomach. O.B. yelled for Jones.

Tyesha Green, who was eight years old, testified that she often played with the defendant when he visited her cousin Shakita. As she, Shakita and another girl named Latonya walked toward O.B.'s store, she saw the defendant leaving the store trying to conceal a black gun in his right arm under his coat. As the defendant ran through an alley, O.B. left the store; he was bleeding from his stomach.

William Jones testified that Black was in his store when he heard O.B. call him. As Jones ran toward the front of the store he saw Black playing a video game. After O.B. fell to the ground, the police arrived. As the police blockaded the front of O.B.'s store, Jones and Black had a 20-minute conversation during which Black told Jones that the defendant had shot O.B. Because Black was afraid, Jones let him out the side door so that Black could avoid the police.

Leonard Dawson had known the defendant for a number of years. At around 7:30 p.m., Dawson was walking down Damen Avenue toward 68th Street and Winchester; as he approached O.B.'s store, he saw the defendant leave with his right hand tucked away. He had known the defendant for three or four years and was on friendly terms with him. He saw him in the neighborhood everyday. Dawson yelled the defendant's name two or three times, and the defendant looked at him and continued to run and conceal his right hand. Dawson saw O.B. stagger out the front door of his store and motion toward Jones' store. After the police arrived, Dawson left.

Some time later, the police came to Dawson's girl friend's house. Dawson accompanied them to 22nd and Clark Street as they searched for the defendant. While at the police station, Dawson gave a written statement in which he told the police what he had seen. At the time he testified, Dawson had a robbery case pending. At the time he made the statement to the police, he was on parole but did not have any charges pending against him. He expected some type of consideration for testifying against the defendant.

Chicago police officer Judith Solava arrived at the scene at approximately 7:30 p.m. She saw O.B. staggering out of a building. He was calling out the name "Hot Rod," a nickname for Jones. She was unable to have any type of a conversation with O.B. A fire department ambulance took O.B. to a hospital where he subsequently died. There was a trail of blood from where O.B. had fallen that led into the store.

Police evidence technician John Stella went to O.B.'s store at 8:30 p.m. He was unable to obtain any fingerprints that were suitable for comparison purposes. The cash register was open. "Miscellaneous change" was inside the register and a large bag containing pennies was lying next to the register. There was no paper money inside the register.

An autopsy of O.B.'s body disclosed six gunshot wounds of entrance. One bullet perforated the lung; another perforated the intestines; one entered his left arm; and two entered the left leg. The skin adjacent to the wound that perforated the lung displayed a pattern of gun powder stippling that was "evidence of close range firing." Only loose change was recovered from his clothes; no paper money was recovered.

Detective Thomas Ptak went to an apartment at 2031 South Clark, and a young woman named Sandra Gilbert answered the door. After the police told her that they had a warrant for the defendant's arrest and showed her an "IR photograph," she let them into the apartment. Ptak did not find the defendant in the apartment at that

time. About 20 minutes later, Ptak and another officer returned to the apartment. Sandra Gilbert again answered and allowed the officers into the apartment. At that time they found the defendant in a bedroom under an "enormous pile" of clothes. When Ptak asked the defendant why the window was open, the defendant said he was thinking about crawling out the window but that he did not think the "cable wires would hold his weight."

Deandre Norman, age 15, testified for the defendant. He knew Dawson, the defendant and Black by their nicknames. At the time he testified he had charges for attempted murder and aggravated battery pending in the juvenile court. He testified that Dawson, nicknamed "Muscle Head," was in a position of authority, "a King," in the Vice Lords street gang. Norman and Black were also members of the Vice Lords; the defendant used to be a member. On May 15, Norman saw Dawson at 2031 Clark Street at around 7:15 p.m. He had a conversation with Dawson. He also saw the defendant at the apartment at that time. The defendant was drinking during Norman's conversation with Dawson. He was shown a signed, written statement that he had given the police. He said that the statement was not true. In the statement he told the police officer that at the time he first saw the defendant on May 15, the defendant was breathing heavily and that it was approximately 8 p.m.

Camia Patten testified for the defendant that in the evening of May 15, 1991, she was at home partying at 2031 South Clark. The defendant was at the party at all times; the party lasted from 6 to 10 p.m. She remembered the 15th because her sister's birthday was on the 16th.

■ We judge that the evidence, viewed in the light most favorable to the State, although circumstantial, was more than sufficient to establish the defendant's guilt beyond a reasonable doubt. The defendant's alibi was contradicted not only by Black and Dawson but, most important, by Tyesha Green, who also knew the defendant and had no motive to testify falsely. In addition, the circumstances surrounding the defendant's arrest, it may be fairly argued, indicate a consciousness of guilt. There is no justification for us to substitute our determination of the credibility of the State's witnesses for the jury's determination.

We turn next to the defendant's claim that improper evidence of the deceased's habits was introduced. We do so because resolution of that claim would assist in resolution of the defendant's other claim that he was not proved guilty of attempted armed robbery beyond a reasonable doubt. If the evidence of the deceased's habits was admissible, that evidence would be probative in determining whether the defendant had been proved guilty of attempted armed robbery.

Linda Jones, the deceased's daughter, testified that on May 15, police called and informed her that her father had been shot while he was at work. In 1984 she worked with O.B. at his store. Although she no longer worked at the store, she visited her father at least once a day. The store was open from 9 a.m. until 10 p.m., seven days a week. During work hours her father always carried approximately $300 to $400 in paper money in his pocket.

Rickey Jones, the deceased's son, testified that he worked with his father for approximately four years, including the day before his father was killed. At the end of each business day, the cash register contained between $300 and $350. Although he was uncertain where his father banked, it was his father's routine practice to leave $50 in the register at the end of the business day. The defendant contends that the testimony of Linda and Rickey Jones that their father routinely carried large amounts of money on his person and kept an amount of currency in the cash register was prejudicial error.

The rule governing admissibility of habit or custom evidence has an uncertain history. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §406 (5th ed. 1990).) Evidence of the careful habits of a decedent was held admissible in wrongful death actions provided there were no eyewitnesses to the occurrence which caused the death. (*Casey v. Chicago Rys. Co.* (1915), 269 Ill. 386, 109 N.E. 984.) The right to introduce evidence of careful habits was extended beyond wrongful death actions but was still restricted to cases where eyewitnesses did not exist or were barred from testifying. *McElroy v. Force* (1967), 38 Ill. 2d 528, 232 N.E.2d 708.

In *Bradfield v. Illinois Central Gulf R.R. Co.* (1985), 137 Ill. App. 3d 19, 484 N.E.2d 365, the Fifth District Appellate Court adopted Rule 406 of the Federal Rules of Evidence (Fed. R. Evid. 406), which permits habit or custom evidence even if eyewitness testimony also is available. The supreme court affirmed the appellate court on other grounds and discussed Federal Rule 406 and its own previous cases, including *McElroy*, which permitted such evidence only where there were no eyewitnesses. The supreme court raised some question whether *McElroy* and the other cases still represented the law but did not express approval or disapproval of Rule 406. *Bradfield v. Illinois Central Gulf R.R. Co.* (1987), 115 Ill. 2d 471, 476, 505 N.E.2d 331.

In *Cairns v. Hansen* (1988), 170 Ill. App. 3d 505, 524 N.E.2d 939, the Second District Appellate Court refused to follow the Fifth District Appellate Court in *Bradfield* and adhered to the view that habit testimony may be admissible only in the absence of eyewitness testimony.

The rule has been discussed with seemingly inconsistent results in cases in which the party offering habit or custom evidence sought to establish other than careful habits.

In *Stolp v. Blair* (1873), 68 Ill. 541, the plaintiff sued to recover money he had allegedly loaned to the defendant, who denied the loan. There was no written proof of the loan. The supreme court upheld the ruling that permitted the plaintiff to show that he loaned money to other persons without requiring written proof of the indebtedness.

In *Thorp v. Goewey* (1877), 85 Ill. 611, the plaintiff sued the estate of his brother, alleging that his brother had signed a note promising to pay the plaintiff. The estate denied that the decedent had executed the note and introduced proof that the decedent was prompt to pay his debts and did not like to be in debt. The supreme court said that the evidence was proper.

In *People v. West* (1981), 102 Ill. App. 3d 50, 429 N.E.2d 599, a case cited by the defendant here, the defendant was charged with theft of railroad property. He defended on the ground that he had a permit authorizing him to take the property. The State contended that the defendant took property not mentioned in the permit. A State witness, an employee of the railroad, was permitted to testify that she usually informed applicants for permits about the specific property mentioned in the permit, but she had no detailed recollection of her conversation with the defendant. The appellate court held that the testimony of the employee was error, but harmless under the facts, and said that the "evidence of habit or general practice is not admissible as proof of behavior and conformity with that habit on a specific occasion." (*West*, 102 Ill. App. 3d at 53.) In support of that pronouncement, the court cited *Goetz v. Country Mutual Insurance Co.* (1975), 28 Ill. App. 3d 154, 328 N.E.2d 109, and *City of Salem v. Webster* (1901), 192 Ill. 369, 61 N.E. 323.

In our judgment, neither of the cases cited by the Second District Appellate Court in *West* supports the broad language in which the court held that evidence of habit or general practice is not admissible. *Goetz*, which is also cited by the defendant here, involved the factual question of whether an insurer had mailed an intention not to renew a policy. The insurer defendant was permitted to show what its regular office practices were. The appellate court implicitly agreed that the evidence was proper but held that it was insufficient to establish the fact of mailing in the absence of any proof that the procedure was followed in that case. In *City of Salem*, the supreme court upheld the trial court's refusal to permit evidence that the plaintiff was ordinarily a "rapid driver." But the court did so for the reason that there was direct testimony as to the occurrence.

■ We judge that the better rule, which has been accepted by the supreme court, although a long time ago, is that habit and custom evidence may be admitted provided that a proper foundation has been established, subject, of course, to the court's discretion. We emphasize at this point that the defendant did not object to the evidence on the ground that a proper foundation had not been established; it was and is the position of the defendant that such evidence is never admissible. We conclude that the trial judge did not abuse his discretion in permitting the evidence. The decedent's daughter testified that she visited her father every day, that he was open for business for 13 hours every day and that every day he carried $300 to $400 in cash on his person. A jury could infer from that evidence that he had a substantial amount of currency on his person on the day of the shooting. The fact that he had no currency on his person after the shooting left the further inference that the shooter took the currency.

We note that the general rule permitting evidence of the careful habits of a decedent has previously been admitted in the absence of eyewitnesses. The courts have based their ruling on the admissibility of the habit and custom evidence on necessity: that is, the fact that the witness in the best position to testify was dead and no one else could testify to the actual occurrence. That reasoning applies here as well, but we hasten to add that we make no pronouncement one way or the other as to the requirement that there be no eyewitness available before habit or custom evidence is admissible.

With that evidence considered, we further judge that a fact finder could conclude that all of the evidence established beyond a reasonable doubt that the defendant had robbed the deceased. The deceased had been open for business for over 10 hours at the time of the shooting. It is unreasonable to infer that he would not have taken in more than some "miscellaneous change" in that period. There was no paper currency in the register or on the deceased's person. The defendant had been looking for money from Black when he was ordered out of the deceased's shop. At the time he heard "six or seven shots go off," Black also heard "a whole lot of, like, change fall." The defendant shot and killed the deceased for some reason, and robbery is the only reasonable one under all the facts. We conclude, therefore, that the evidence was sufficient to establish the defendant's guilt of armed robbery.

We do not understand why the defendant was charged with attempted armed robbery rather than armed robbery. However, attempted robbery is a lesser included offense of robbery, and one may be convicted of an attempt to commit an offense, even though

the evidence establishes that the defendant committed the substantive offense. *People v. Wallace* (1974), 57 Ill. 2d 285, 312 N.E.2d 263.

The defendant next maintains that prejudicial error occurred when Officer Ptak testified that he showed an "IR photograph" to the woman who answered the door of the apartment where the defendant was arrested. In response to a question, he described an "IR photograph" as a "Chicago Police Department identification record photograph." No objection was made to that testimony. Later, when the officer was asked about some of the circumstances surrounding the defendant's arrest the following occurred:

"Q. And did you do anything to verify who he was?

A. At first I took him out of the closet. I told him to brush himself off to get the bugs off.

[DEFENDANT'S ATTORNEY]: Can we have a side-bar?

THE JUDGE: Sure.

[Out of the presence of the jury]

[DEFENDANT'S ATTORNEY]: He already let it pass once. I would object to the officer testifying in one of the ways that he verified who it was—Hilton Keller was the IR, the IR photo that he had. I would object to any reference again to the IR photo."

■ The officer then completed his testimony without any further reference to the IR photograph. We conclude that the defendant has failed to preserve this question for review because of lack of a timely objection. Moreover, the objection that was made later was to any further reference to the IR photo, and no further reference was made. While we judge that the record in criminal cases would be better served if prosecutors stopped emphasizing that photographs used for identifications are police photographs, we further judge that the evidence was harmless in this case.

The defendant's last claim is that his sentence was excessive. He maintains that his extended term of 70 years must be reversed because the trial judge did not make express findings that the killing was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).) He maintains also that the record does not support a finding that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

■ Initially, we reject the State's argument that the defendant waived his right to contest his sentence for failure to object to the sentence in the trial court. (*People v. Lewis* (1994), 158 Ill. 2d 386, 634 N.E.2d 717.) Second, we know of no case which required the sentencing judge to articulate his express findings that the crime was exceptionally brutal or heinous. We read *People v. Lucas* (1989), 132

Ill. 2d 399, 548 N.E.2d 1003, to mean that such express findings are not necessary. We also read the judge's sentence in this case to be an implied finding that the crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, because that is the only part of the statute that could be applicable here.

Last, it is not our function to substitute our judgment for that of the trial judge in sentencing. We may not gainsay his sentence unless we are convinced that it represented an abuse of discretion. The defendant cites two cases, *Lucas* and *People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025. *Lucas* is not on point; that was a case involving a review of the death penalty. As was pointed out in *Andrews*, both the defendant and the State are able to cite to appellate court cases reversing or upholding extended-term sentences given under section 5—5—3.2(b)(2). Each case, however, must rest upon its own facts. We believe that there is ample factual precedent to support the judge's finding that the killing was exceptionally brutal and indicated wanton cruelty. (See, *e.g., People v. Barfield* (1989), 187 Ill. App. 3d 190, 543 N.E.2d 812; *People v. Bishop* (1989), 179 Ill. App. 3d 99, 534 N.E.2d 401.) The defendant has expressed no remorse, a factor to be considered, for the killing of a 50-year-old shopkeeper, whom he shot *six* times.

The judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.